Hunt v. Woods.

Opinion delivered March 30, 1925.

1. MINES AND MINERALS—MODIFICATION OF DRILLING CONTRACT.— Where the original contract under which plaintiffs drilled a well on defendants' land was modified by a supplemental contract, whereby defendants took over the drilling outfit for the purpose of drilling a new well, in order that a proper test might be made for gas and oil, the original contract was superseded by the supplemental contract to the extent that their terms were inconsistent, and to that extent performance under the first contract was waived.

2. CONTRACTS—RESCISSION.—When a new contract is inconsistent with and renders performance of a former one between the same parties impossible, the former is rescinded.

3. MINES AND MINERALS—COST OF DRILLING WELL—EVIDENCE.— Evidence *held* to support the allowance made by the court for the cost of drilling a well under a supplemental contract whereby the landowners took over a drilling outfit to drill a well at drillers' expense, and to sustain the award to the drillers of the rent of the outfit and damages for detention, loss of parts, and wear and tear.

4. MINES AND MINERALS—RESCISSION OF CONTRACT—DAMAGES.— Where the original contract under which plaintiffs agreed to drill a well on defendants' land was modified by a supplemental contract under which all disputes under the first contract were settled, the chancellor improperly allowed plaintiffs damages for delay as to work under the first contract.

Appeal from Drew Chancery Court; *E. G. Hammock,* Chancellor; judgment modified.

STATEMENT OF FACTS.

On the 6th day of May, 1922, G. A. Woods and A. S. Woods, partners as Woods Bros., commenced this action in the circuit court against R. T. Clark and T. D. Hunt to recover possession of a drilling outfit and damages for the detention of the same.

On the 5th day of September, 1922, the plaintiffs filed a supplemental complaint against the defendants in which they alleged that the defendants had returned to the plaintiffs the drilling outfit described in the original complaint, and that there remains nothing for adjudication between the parties, except the indebtedness due by the defendants to the plaintiffs. It is alleged that the defendants on account of their negligence lost and damaged many parts of said drilling outfit. An account of the indebtedness between the parties under their various contracts is attached as an exhibit to the complaint.

The prayer of the complaint is that the plaintiffs recover judgment against the defendants in the sum of $13,167.72, the balance alleged to be due after a statement of their accounts.

On the 11th day of September, 1922, the case was by agreement transferred to equity. The defendants

filed an answer in which they denied all the allegations of the complaint and set up matters which entitled them to judgment against the plaintiffs in the sum of $40,000, or such sum as a master may find that the defendants are entitled to recover of the plaintiffs after stating an account between them.

On the 6th day of September, 1921, a written contract was entered into between R. T. Clark and T. D. Hunt as parties of the first part, and G. A. Woods and A. S. Woods, as parties of the second part. Under the agreement the parties of the second part agreed to drill a test well for oil and gas for the parties of the first part on the land described in the complaint to a depth of 2,500 feet, unless oil or gas was found in paying commercial quantities at a lesser depth. The parties of the second part agreed that, in case they failed, or conditions were such that they could not complete said well to a depth of 2,500 feet, they would move the derrick to another location on said land and drill until they had reached the required depth.

The agreement also provided that the parties of the second part should only be required to move the distance deemed necessary by them when they had to relocate and drill another hole in the case they failed to complete the well that they had attempted to drill. The parties of the first part agreed to furnish at the drilling site, all fuel, water, grease, oils, casing and derrick. They also agreed to pay the sum of $50 per month for a man to pump water during the drilling operations and to repair all breakage on the pump and engine.

The parties of the second part agreed to furnish the parties of the first part a complete log of the well showing their daily operations, the structures that the drill might pass through, and the depth of all materials drilled through.

The parties of the first part also agreed to pay the parties of the second part the sum of $15,000 for the completion of the well.

Other matters set up in the written contract will be stated or referred to in the opinion.

After the test well was dug to the depth of from 1,538 to 1,565 feet, the parties had a dispute as to whether the contract had been complied with in making a test for gas and oil as the work of drilling the well progressed. This led to the making of a supplemental contract on the 12th day of November, 1921, which was also in writing.

This contract provides that it shall be known as a supplemental agreement to the original contract, dated September 6, 1921. It recites that, if the parties of the second part have failed to comply with the terms of their original contract for the testing of the structures called for in drilling the well, they agree to allow the parties of the first part to take over the drilling machinery and equipment for the purpose of drilling a new well and making a complete test at a depth of approximately 1,550 feet.

The contract further provides that the parties of the first part shall have full possession of the equipment, shall hire all labor, shall remove the derrick and machinery, and that the cost of moving and drilling the new well shall be charged to the parties of the second part. The contract also provides that, should the well be ruined and another test be necessary, then the money due shall be paid at once to the parties of the second part, and the original contract completed.

The contract also provides that the parties of the first part shall keep the machinery in good repair, less the usual wear and tear of it.

It also provided that the party of the first part shall pay the parties of the second part all moneys which may be due them under their original contract after the cost of the second well has been deducted.

On the 12th of November, 1921, said parties also entered into another contract in writing whereby the parties of the first part rented from the parties of the second part their drilling rig and all its equipment for the purpose of drilling a test well for oil and gas below a

depth of 2,400 feet.  The parties of the first part agreed
to pay to the parties of the second part $25 per day for
the use of said equipment.  The parties of the first part
agreed to keep the drilling machinery in good repair
and deliver it back in as good condition as it was when.
they received it.

Other evidence will be stated or referred to in the
opinion.

The chancellor found the issues in favor of the plain-
tiffs and delivered a written opinion giving his reasons
for so doing.

The chancellor restated the accounts between the
parties as follows:

"To contract price well, contract A......$15,000.00
Service water pumper........................................    100.00
16 days delay 1st test......................................  1,200.00
Rent of rig, contract C....................................  1,350.00
Lost articles and damage to equip-
    ment .................................................................  1,725.35
Value of rig detained..................................  1,950.00
                                                                      _____
                                                                      $21,325.35

By  amount  paid  by
    defendants  ................$9,402.00
Labor at second well...... 2,000.00   $11,402.00
                                                         _____
                                          "$9,923.35"

A decree was entered in accordance with the findings
of the chancellor, and to reverse that decree the defend-
ants have duly prosecuted this appeal.

*Henry & Harris,* and *L. C. Going,* for appellant.

*J. G. Williamson, Lamar Williamson* and *Adrian
Williamson,* for appellee.

HART, J., (after stating the facts).  When the
plaintiffs  had  drilled  the  first  well  under  the
original  contract  to  a  depth  of  1,538 feet, the  log
kept by them contained this notation, "well is showing
oil and gas very heavy."  According to the evidence for
the plaintiffs, they reported this fact to a representative

of the defendant, who was on the ground, and received orders to shut down and wait for the casing which was to be furnished by the defendants in making a test for oil and gas. The log shows that the plaintiffs next began to drill on October 10, 1921. They say that the defendants failed and refused to furnish the casing with which to make the test.

On the other hand, according to the evidence for the defendants, the failure to make the test was due to the action of the plaintiffs.

The view we have taken of the matter renders it unnecessary for us to decide this question. The parties compromised their differences in this respect by the execution of the supplemental agreement of November 12, 1921. This agreement expressly recites that it is a part of the original contract dated the 6th day of September, 1921. It also recites that the nature of the agreement is such that the parties of the second part of the original agreement have failed to comply with the terms of their contract for the testing of the structures as called for in their contract for the drilling of the well, and that they agree to allow the parties of the first part to take over their drilling machinery and equipment for the purpose of drilling a new well and making a complete test at the depth of approximately 1,550 feet.

The contract further provides that the parties of the first part shall have full possession of the equipment and shall move the derrick and machinery and charge the cost of moving it to the parties of the second part.

Thus it will be seen that the supplemental agreement by its express terms modifies the original agreement. In it the parties of the second part recognize that they have failed to make the test required in drilling the first well and agree to turn over their drilling machinery and equipment to the parties of the first part to drill a new well in order that proper tests may be made for oil and gas as the drilling progresses.

The new well was to be drilled by the parties of the first part of the depth of 1,550 feet. This showed that

the new well was to be tested at this depth by the parties of the first part for oil and gas. The supplemental agreement imposed new conditions upon the parties to the original agreement, and modified it to the extent that the provisions of the original agreement were changed by those of the supplemental agreement.

The contract when changed by the mutual consent of the parties became a new contract and took the place of the old one in so far as the terms are inconsistent. In other words, the new contract supersedes or modifies the old one to the extent that their terms are inconsistent. *Ozark & Cherokee Cent. Ry. Co.* v. *Ferguson,* 92 Ark. 254; *Murray* v. *Miller,* 112 Ark. 227, *Weaver* v. *Emerson-Brantingham Imp. Co.,* 146 Ark. 379.

It follows that the defendants by making the supplemental agreement with the plaintiffs lost all right to rely upon the first contract either to enforce it as a contract, or to rely upon it in a suit for damages for a breach thereof to the extent that the first contract was changed or modified by the supplemental contract. It has been well said that when a new contract is inconsistent with and renders the performance of a former one between the same parties impossible, the former is rescinded upon the same principle that a subsequent act of the Legislature repeals a former act, when the two are inconsistent. *Paul* v. *Meservey,* 58 Me. 419.

It follows that a waiver of performance under the first contract arose when the supplemental contract was entered into in so far as the test provided for in drilling the first well is concerned.

This brings us to a consideration of the statement of the accounts between the parties. The supplemental contract of November 12, 1921, provides that the parties of the first part shall pay the parties of the second part all moneys which may be due them under their original contract after the cost of the second well has been deducted.

Under the terms of the original contract the parties of the first part agreed to pay the parties of the second

part the sum of $50 per month, for the time the drilling crew was in operation, for a man to pump water. This service was performed for about two months, and the chancellor properly allowed the plaintiffs one hundred dollars for the services of a water pumper. The contract price of the well under the original contract was $15,000, and the chancellor properly allowed this sum, less the cost of drilling the second well. The chancellor allowed the defendants $2,000 for drilling the second well.

G. A. Woods and A. S. Woods both testified that this was a reasonable sum for the cost of the second well. They were corroborated by the testimony of three disinterested drilling contractors, who testified that the well could have been drilled in from ten to twenty days at most, and that $2,000 was a reasonable sum for the cost of drilling it.

According to the testimony of J. W. Jolly, who was in complete charge of drilling the second well, he did not commence it until after January 6, 1922, and completed it by the second day of February, 1922.

While the defendants submitted an expense account much larger than the sum of $2,000, we think that the decision of the chancellor was correct in only allowing that sum. It must be remembered that the defendants were not to receive any profit for drilling the second well, but were only allowed the cost of drilling it. The drilling outfit belonged to the plaintiffs, and the wear and tear on it was very great. Hence drilling contractors were usually allowed a large profit for drilling wells when they supplied their own drilling machinery and equipment. In fixing the price to be paid the plaintffs for drilling the first well, the profits were included. In determining what the profits were, of course their services, the rental value of the drilling outfit, and the wear and tear on the machinery would all be estimated.

We are of the opinion that, when all the testimony is considered, the chancellor did not err in finding that $2,000 was the actual cost of drilling the second well to the depth of 1,550 feet.

The chancellor also allowed the plaintiffs the sum
of $1,350 for the rent of their drilling outfit in order
to enable the defendants to drill the well deeper than
provided for in the first contract.

When the two contracts of the date of November 12,
1921, were executed one of them provided that the defend-
ants had rented from the plaintiffs their complete drill-
ing outfit for the purpose of drilling a test well for oil
and gas below the depth provided in the first contract,
and as rent they agreed to pay $25 per day for the drill-
ing outfit.    The defendants took charge of the drilling
outfit of the plaintiffs when this contract was executed
on the 12th day of November, 1921, and used it in drilling
the first well deeper until the 6th day of January, 1922.
Therefore, the chancellor properly allowed the sum of
$1,350 for the rent of the drilling outfit under this con-
tract.

The chancellor also allowed the plaintiffs $1,950 for
damages on account of the defendants unlawfully detain-
ing their drilling equipment, under the supplemental con-
tract.    The drilling of the second well was completed on
the 26th day of April, 1922.    There was no showing of
oil or gas at the depth drilled.    On the 5th day of May,
1922, the plaintiffs made a demand in writing of the
defendants for the immediate possession of their drilling
outfit.    On the 6th day of May, 1922, the original com-
plaint in this case was filed.    As we have already seen,
the suit was commenced in the circuit court for the pur-
pose of obtaining possession of the drilling outfit and
damages for the unlawful detention of the same.    The
drilling outfit was not returned by the defendants to the
plaintiffs until the first day of July, 1922.

The plaintiffs introduced evidence tending to show
that the rental value of their drilling outfit was not less
than $50 per day.    The defendants introduced evidence
tending to show that its rental value was a very much
smaller sum.

The court allowed the plaintiffs $30 per day for the
wrongful detention of their drilling outfit, and, after a

careful consideration of the evidence on this point, we
are of the opinion that the finding of the chancellor is
not against the weight of the evidence. Therefore it will
• be allowed to stand.

The plaintiffs also made claim for lost articles and
damage to their equipment in the sum of $2,982.07, and
the court allowed them $1,725.35. Here again we find
the testimony in direct conflict. The chief item on this
list was 1,650 feet of drill stem estimated by the plaintiffs
to be worth $1,497.38. This was the cost of the lost drill
stem. On the part of the defendants it was shown that
there was only 1,300 feet of drill stem lost, and that it had
been badly damaged.

The next item was twenty Hickman tool joints at
$30 each, of the total value of $600. According to the
testimony for the defendants, these tool joints were very
badly damaged.

The next largest item was $500 estimated to be the
damage to the entire outfit above its ordinary wear and
tear. The other items on the list were from eleven to
seventy-five dollars each for lost tools. We do not think
the plaintiffs sustained the loss of the item of $500 for
damages to the entire outfit above ordinary wear and
tear. While drilling machinery wears out very quickly
and is very expensive, as we have already seen, these
matters are taken into consideration in fixing the profits
to be received by their owner in making drilling con-
tracts. After due consideration of the items on this
list, we cannot say that the finding of the chancellor in
this respect is contrary to the weight of the evidence, and
his finding on it will be allowed to stand.

The chancellor allowed the plaintiffs the sum of
$1,200 damages for sixteen days' delay in making the first
test. The original contract provided that the defend-
ants should have the right to delay drilling the well by
notifying the plaintiffs to stop drilling, and that for such
delay the defendants should pay the plaintiffs the sum
of $75 per day. It is claimed by the plaintiffs that this
sixteen days' delay before the first test was occasioned by

the defendants telling them to shut down in order to set an eight-inch casing for the purpose of making the test.

The claim of the plaintiffs for damages in this respect was settled by the supplemental contract of November 12, 1921. As we have already seen, the original contract was modified by it, and its provisions were substituted in part for the provisions of the original contract. It appears both from the terms of the supplemental contract and from the testimony in the case that it was the intention of the parties to adjust all their differences under the first contract by the execution of the two contracts of the date of November 12, 1921. Hence, for the reasons given in the beginning of the opinion where this phase of the case was discussed, we are of the opinion that the chancellor erred in allowing the plaintiffs the $1,200 item for the sixteen days' delay in making the first test.

The plaintiffs have taken a cross-appeal, and they insist that the chancellor erred in not allowing them $461.10 for the delay in furnishing water under the original contract. For the reasons given above, the claim of the plaintiffs for damages in this respect was also settled under the supplemental contract of November 12, 1921.

There are several other smaller items argued in the brief on the cross-appeal, but we do not deem it necessary to give them a separate discussion. We are of the opinion, after a careful consideration of the testimony, that the finding of facts made by the chancellor was correct, except as to the $1,200 item above stated.

Several other matters are argued at length in the respective briefs of the attorneys on both sides; but the conclusions of law which we have reached and announced above renders it unnecessary to set out or discuss these matters.

If we are correct in holding that the purpose of executing the supplemental contract of November 12, 1921, was to modify the original contract and to adjust

all prior differences and claims of damages of the parties under that contract, it follows that the chancellor was right in his statement of the accounts between the parties, except as above indicated.

The result of our views is that the chancellor should have rendered judgment in favor of the plaintiffs against the defendants for the sum of $8,723.35, instead of $9,923.35. Therefore it will be ordered that judgment be rendered here in favor of the plaintiffs against the defendants for the sum of $8,723.35 with six per cent. interest thereon from the 31st day of October, 1923, the date of the decree in the chancery court, until paid.

It is ordered that the decree of the chancery court be modified as indicated in the opinion, and as modified that it be affirmed.